Linda **JENNESS** et al., Plaintiffs,

v.

Donald C. **FORBES**, Commander, Quonset Point Naval Air Station, and Melvin Laird, Secretary of Defense of the United States.

Civ. A. No. 4855.

United States District Court,
D. Rhode Island.

Aug. 10, 1972.
and
Supplemental Opinion Nov. 2, 1972.

Milton Stanzler, Providence, R. I., David Rosenberg, Cambridge, Mass., for plaintiffs.

Lincoln C. Almond, U. S. Atty., R. I., Constance L. Messore, Asst. U. S. Atty., R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Plaintiffs seek to have declared unconstitutional defendants' policy denying access to the Quonset Point Naval Air Station (hereinafter sometimes referred to as Station or Quonset) to any political group soliciting votes in a political election and further pray for injunctive relief from interference with their campaign activities at the station.

The matter is now before the court on the litigants' cross motions pursuant to Fed.R.Civ.P. 12(c). However, since matters outside the pleadings in the form of affidavits and stipulations submitted by the parties are to be considered, the motions will be treated as though for summary judgment under Fed.R.Civ.P. 56.

The jurisdictional allegations of the complaint will be construed liberally here where there is a claim of infringement of constitutional rights. The allegations of denial of First Amendment rights are sufficient to establish jurisdiction under 28 U.S.C. § 1331. Murray v. Vaughn, 300 F.Supp. 688, 694–696 (D.R.I.1969). See also Fifth Avenue Peace Parade Committee v. Hoover, 327 F.Supp. 238 (S.D.N.Y.1971); Cortright v. Resor, 325 F.Supp. 797 (E.D.N.Y. 1971); Comment, Can the Section 1331 Amount Requirement Constitutionally Bar a Plaintiff Alleging Violation of His First Amendment Rights from Using the Federal Courts to Get an Injunction Against a Federal Officer, 50 B.U. L.Rev. 178 (Special Issue 1970).

*Findings of Fact*

On January 19, 1972, Miss Linda Jenness, the candidate of the Socialist Workers Party for President of the United States, and Dr. Benjamin Spock, presidential candidate of The Peoples Party, jointly requested permission of the Commanding Officer of Quonset Point Naval Air Station to distribute campaign leaflets and hold a meeting on the base.[1] They stressed their willingness to abide by any reasonable restrictions as to time, manner and place of their campaign activities.

In their affidavits submitted with the motions they describe the character of their political parties as being particularly attractive to certain segments of society, including members of the armed forces. They cite the need for personal contact to overcome their "obscurity" and lack of financial resources.

On January 27, 1972, R. W. Frame, Commanding Officer of the Station, denied their request, stating, "It is the policy of the Department of Defense to avoid conduct that either directly or indirectly endorses or selectively benefits or favors or appears to endorse or selec-

---

1. Text of letter to Commanding Officer, Naval Air Station, Quonset Point, R. I. "As declared presidential candidates, we request your permission under appropriate regulations to enter the Quonset Point Naval Air Station for the purpose of bringing the issues of our campaigns to the voters at the base, and of learning the views and attitudes of the troops there on the major issues of today and reporting their feelings to the public.

We believe that military personnel are an important component of the electorate and, as such, should participate in the discussion of the political issues of the 1972 campaign.

We are requesting permission to distribute our campaign literature and to discuss our campaigns with the sailors there. In addition, we request that you provide us with a suitable meeting hall where we can present our views to the U. S. Naval personnel at a public meeting.

It is not our intention to interfere in any way with the normal operations and functioning of the post, and we will, of course, abide by any reasonable restrictions as to the time and places of our campaigning.

We request such authorization for the date of Tuesday, February 29, 1972. Because of the heavy schedules of our campaigns, and the advance arrangements we must make, we would appreciate the earliest possible reply.

Sincerely"

Filed with plaintiffs' motion pursuant to Fed.R.Civ.P. 12(c) and 56 as plaintiffs' exhibit A.

tively benefit or favor any political group, or is associated with the solicitation of votes in a political election."

Quonset is one of the principal naval installations in the country covering 2611 acres manned by over eleven thousand military and civilian personnel (Military 5,879; civilian—excluding students 4,708; students 809). It is typical of many such stations with a post office, navy exchange, retail store offering books and magazines of all sorts, shops, gas station, commissary store, civilian restaurant, golf course, chapel, theatre, etc. It is adjacent to and abuts another military installation, the Davisville Construction Battalion Center. Excepting for certain housing facilities, both Quonset and Davisville are entirely enclosed by a perimeter fence topped with strands of barbed wire. All access to both complexes flows through four gates. Two of these gates, one for Davisville and the other for Quonset are open 24 hours a day, whereas the other two are only opened to accommodate rush hour traffic to enter and exit. All gates, whenever open, have armed sentries present who are charged with the responsibility of permitting entrance to only authorized persons, that is, persons having official business on the station. A member of the general public can only enter the enclosure by obtaining a pass, which requires self identity, statement of business and place or person being visited. After verification a pass is issued. The civilian workers are given identification badges, which they are required to show in order to gain entrance.

Once a year for three consecutive days in June a Naval Relief Carnival is sponsored on the station that attracts approximately 100,000 to 200,000 visitors. Though the public is automatically allowed to enter without passes or identification, security is increased throughout the installation with additional forces and "called in" Army Reservists. At such times certain areas are closed off and traffic is guided as it enters the station along patrolled roads to and from the carnival.

Though the enclosed area has approximately 25 miles of road, all are within Quonset itself and cannot be termed important traffic arteries but for its own self-contained purposes. In short, they lead nowhere for the public in general and in no way can they be termed " . . . completely open streets" as in Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), reversing 452 F.2d 80 (5th Cir. 1971).

Except for a trailer park, most family housing facilities are external to the perimeter fence and within a short drive of the main gate. Assuming 4.5 persons per housing unit, as stipulated by the parties, the population statistics for these housing areas are as follows: Hoskins Park—333; New Wickford—100; Old Wickford—262; Kiefer Park—204; Military Drive—200; areas 1 and 2—200. The estimated total occupancy, including the trailer park, is 1,595 persons. None of these housing areas are in any way enclosed, but on the contrary are open communities off of main traffic routes fully accessible to anyone at any time of the day or night. Outside of the characteristic architecture of government housing and a modest sign where the public road merges into government property advising that government property is being entered, the housing areas can hardly be distinguished from any other residential section. There are no stores of any kind. No one is allowed to engage in commercial activities without permission of the Commanding Officer, whose determination is based on whether or not the prospective merchant fits within certain commercial solicitation restrictions. Such permission has been granted to some under certain terms and conditions and denied to others. There are milk, newspaper, laundry deliveries and taxi cabs are allowed to enter on call or deliver passengers. Those who disregard restrictions are deemed trespassers subject to apprehension by the station's se-

curity forces. Custody of such individual is then given to the United States Marshall. All policing down through traffic violations and accident investigations is conducted by the Shore Patrol.[2]

Presently the Navy is stimulating voter registration as evidenced by a Navy Directive entitled the "Navy Voting Campaign 1972". It states in part, "Important as it is to vote, it is even more important to vote as intelligently as possible," and toward this end the Navy furnishes its personnel with a variety of information concerning, among other things, presidential election rules, residency requirements, primary elections and the like. To assist personnel, every ship, station and squadron is required to establish "Voter Assistance Teams."

The entire directive[3] is educationally geared toward the mechanism of the electoral process. Though one section provides the addresses of the major political party state headquarters and does not list such minority groups as are involved in this litigation, it does state, "Partisan information may be obtained by members from relatives and friends at home, subscription to hometown newspapers and political organizations."[4]

5 U.S.C.A. Sec. 301 and 10 U.S.C.A. Sec. 133[5] provide the authority for the promulgation by the Secretary of Defense of the Department of Defense Directive 5410.18 (February 9, 1968, modified by change 2 of November 27, 1968) prohibiting the Department of Defense from participating and cooper-

---

2. To more fully develop the facts, a view was taken. As a result of this view, a recorded in-chambers conference, submitted affidavits, and filed stipulations the Court has made these findings of fact.

3. Paragraph 10d BUPERS Note 1742—1 Feb. 1972. Attached to Pl. Ex. A filed with plaintiffs' motion pursuant to Fed. R.Civ.P. 12(c) and 56.

4. Paragraph 10d supra note 3.

5. 5 U.S.C.A. § 301.
   "§ 301. Departmental regulations
   The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 379."
   10 U.S.C.A. § 133.
   "§ 133. Secretary of Defense: appointment; powers and duties; delegation by
   (a) There is a Secretary of Defense, who is the head of the Department of Defense, appointed from civilian life by the President, by and with the advice and consent of the Senate. A person may not be appointed as Secretary of Defense within 10 years after relief from active duty as a commissioned officer of a regular component of an armed force.

   (b) The Secretary is the principal assistant to the President in all matters relating to the Department of Defense. Subject to the direction of the President and to this title and section 401 of title 50, he has authority, direction, and control over the Department of Defense.

   (c) The Secretary shall report annually in writing to the President and the Congress on the expenditures, work, and accomplishments of the Department of Defense during the period covered by the report, together with—
   (1) a report from each military department on the expenditures, work, and accomplishments of that department;
   (2) itemized statements showing the savings of public funds, and the eliminations of unnecessary duplications, made under section 125 of this title;
   (3) a report from the Reserve Forces Policy Board on the reserve programs of the Department of Defense, including a review of the effectiveness of chapters 51, 337, 361, 363, 549, 573, 837, 861, and 863 of this title, as far as they apply to reserve officers; and
   (4) such recommendations as he considers appropriate.

   (d) Unless specifically prohibited by law, the Secretary may, without being relieved of his responsibility, perform any of his functions or duties, or exercise any of his powers through, or with the aid of, such persons in, or organizations of, the Department of Defense as he may designate. Added Pub.L. 87–651, Title II, § 202, Sept. 7, 1962, 76 Stat. 517."

ating directly or indirectly in any activity which favors any political group.[6] The Chief of Naval Operations, Navy Department, Washington, D. C., in turn implemented this policy with the approval of the Secretary of the Navy in its U.S. Navy Public Affairs Regulation Manual.[7]

Captain Frame acted under the explicit authority of these regulations ". . . issued by the Secretary of the Navy with the approval of the President." 10 U.S.C. § 6011 and as a consequence they ". . . have the force of law. Cafeteria & Restaurant Workers Union, Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L. Ed.2d 1230 (1961)". Rehart v. Clark, 448 F.2d 170, 173 (9th Cir. 1971); see also 18 U.S.C. § 1382.

*Conclusions of Law*

The plaintiffs rely on well established First Amendment precepts and cite much decisional law in support of their position that First Amendment rights of freedom of speech are entitled to the most vigilant protection in our courts.

However, the considerations which govern protection of First Amendment rights in the civilian sector have not traditionally been thought to control in the military sector. It comports with tradition,

"To say that a military base is [not] like the company town in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1945), a city as in Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1968), a shopping center as in Amalgamated Food Employees [Union] Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed. 2d 603 (1967), state capitol grounds as

in Edwards v. South Carolina, 372 U. S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1962), a bus terminal in Wolin v. Port of New York Authority, 2 Cir., 1968, 392 F.2d 83, or the World's Fair Grounds as in Farmer v. Moses, 232 F.Supp. 154 (S.D., New York, 1964) . . . . the undisputable fact [is] that military bases do not extend a general and open invitation to the public to use their facilities. A military base simply cannot be said to be dedicated to general use by the public at large."

United States v. Flower, 452 F.2d 80, 83. Cf. Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

As was pointed out by the Court in *Flower, supra,* unlike towns, shopping centers, and parks a military base has not been "[h]istorically . . . associated with the right of assembly and opportunities for the communication of thought which are common to public questions."

In Cafeteria & Restaurant Workers Union, Local 473 AFL–CIO v. McElroy, supra, we find the following language:

". . . . . *The control of access to a military base is clearly within the constitutional powers granted to both Congress and the President.* Article I, § 8, of the Constitution gives Congress the power to 'provide and maintain a navy;' to 'make rules for the government and regulation of the land and naval forces;' to 'exercise exclusive legislation . . . over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings;' and to

---

6. "Department of Defense participation and cooperation must not directly or indirectly (a) endorse or selectively benefit or favor, or appear to endorse or selectively favor, any private individual, sect, fraternal organization, commercial venture, or political group or (b) be associated with solicitation of votes in a political election."

Section C "Guidelines" paragraph IV "Policy." Attached to defendants' Motion to Dismiss Fed.R.Civ.P. 12(b) (6).

7. NAVSO P 1035 Rev. (12–65) page 79, par. B 1201.5. Attached to defendants' Motion to Dismiss, Fed.R.Civ.P. 12(b) (6).

'make all laws which shall be necessary and proper for carrying into execution the foregoing powers . . .' Broad power in this same area is also vested in the President by Article II, § 2, which makes him the Commander in Chief of the Armed Forces." (Emphasis supplied.)

"Congress has provided that the Secretary of the Navy 'shall administer the Department of the Navy' and shall have 'custody and charge of all . . . property of the Department.' 10 U.S.C. § 5031(a) and (c). In administering his Department, the Secretary has been given statutory power to 'prescribe regulations, not inconsistent with law, for the government of his deparment, . . . . and the custody, use, and preservation of the . . . . property appertaining to it.' 5 U.S.C. § 22."

And at page 893 of 367 U.S., at page 1747 of 81 S.Ct. the Court continues:

"This power (to remove persons from military installations) has been expressly recognized many times. 'The power of a military commandant over a reservation is necessarily extensive and practically exclusive, forbidding entrance and controlling residence as the public interest may demand.' 26 Op.Atty.Gen. 91, 92. 'It is well settled that a post commander can, in his discretion, exclude all persons other than those belonging to his post from post and reservation grounds.' JAGA 1904/16272, 6 May 1904. *'It is well settled that a Post Commander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline* (1918 Dig.Op.J.A.G. 267 and cases cited).' JAGA 1925/680.44, 6 October 1925." (Emphasis Supplied)

The Court recognizes that *Cafeteria Workers* did not face a claim of deprivation of First Amendment rights.

However, dicta in *Cafeteria Workers* concerning judicial deference to the necessities of military command has significance here.

A commanding officer must have wide discretion in fashioning permissible conduct within the realm of his command. Though the military commander is circumscribed by constitutional standards, First Amendment freedom of speech must be applied in relation to the uniqueness and purpose of the military installation.

The military has sensitive interests in the demands imposed by training and disciplining soldiers, and technological development of weapons, which is necessarily at times enshrouded in secrecy. It is essential to the security of this nation. In short, the interest of good order and military discipline is a national public interest and the hierarchy of command is best qualified to determine the compelling nature of such interests in the application of regulations having the force of law.

Such determination is subject to the scrutiny of this court and absent evidence to the contrary I must conclude applying the standard discussed, infra, it cannot be assailed; that Captain Frame in the exercise of the responsibility of his command rightfully finds that the safeguarding of these interests demands that access to Quonset's closed areas be subject to his control and, therefore, maintains a strictly closed post. The internal security measures thus employed must be deemed to be intrinsic in the protection of the military function of the station.

However, the difficulty lies in determining the applicable standard of review for this First Amendment claim involving a "closed post" as against more open posts permitting varying degrees of intrusion. I conclude the standard of review is for arbitrariness and capriciousness because I believe *Flower*, supra, by implication forecloses consideration by this Court of competing First Amendment interests when a mili-

tary installation is a closed one, as is the area of Quonset within the perimeter fence.

The Court stated in *Flower*

"The First Amendment protects petitioner from the application of § 1382 under *conditions like those of this case*."

(emphasis added)

Since the factual situation at hand presents an entirely closed post as opposed to a ". . . completely open street" I find deference must be given to the historical power of a Post Commander under authority conferred on him by law to control access to his base —a power that is "practically exclusive" and "necessarily extensive."

The court found in *Flower* that the situs in question was a completely open street and that ". . . the military has abandoned any claim that it has special interests in who walks, talks, or leaflets on the avenue." It could not then exclude the public.

"We reverse. Whatever power the authorities may have to restrict general access to a military facility, see Cafeteria & Restaurant Workers [Union, Local 473, AFL–CIO] v. McElroy, 367 U.S. 886 [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961), here the Fort Commander chose not to exclude the public from the street where petitioner was arrested. As Judge Simpson, dissenting, noted below:

'There is no sentry post or guard at either entrance or anywhere along the route. Traffic flows through the post on this and other streets 24 hours a day. A traffic count conducted on New Braunfels Avenue on January 22, 1968, by the Director of Transportation of the city of San Antonio, shows a daily (24 hour) vehicular count of 15,110 south of Grayson Street (the place where the street enters the post boundary) and 17,740 vehicles daily north of that point. The street is an important traffic artery used freely by buses, taxi cabs and other public transportation facilities as well as by private vehicles, and its sidewalks are used extensively at all hours of the day by civilians as well as by military personnel. Fort Sam Houston was an open post; the street, New Braunsfels Avenue, was a completely open street.' 425 F.2d 80, 90.

Under such circumstances the military has abandoned any claim that it has special interests in who walks, talks, or leaflets on the avenue. The base commandant can no more order petitioner off of this public street because he was distributing leaflets than could the city police order any leafleteer off of any public street. Cf. Lovell v. City of Griffin, 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949] (1838), Schneider v. State [of N. J.], 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155] (1939). '[S]treets are natural and proper places for the dissemination of information and opinion,' 308 U.S., at 163 [60 S.Ct. 146, at 151]. '[O]ne who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion.' Jamison v. Texas, 318 U.S. 413, 416 [63 S.Ct. 669, 672, 87 L.Ed. 869] (1943)."

*Flower*, supra, 407 U.S. at 198, 92 S. Ct. at 1843.

A factual comparison with *Flower*, supra, unhesitatingly causes me to find that the commanding officer of "Quonset" has never abandoned his special interest in who enters the station enclosure and therefore his order denying the plaintiffs' request to distribute campaign literature and permission to address voters therein is valid unless applied arbitrarily or capriciously.

The only measure of such application before this court is its uniform imposition on all politicizing activities. No creditable evidence has been presented attacking Captain Frame's blanket prohibition as an arbitrary or capricious command when viewed as to its necessity to safeguard the interest of good order and military discipline. I can only

conclude that the directive is in no way arbitrary, capricious or discriminatory as a security measure to safeguard military interest, and as to its application it prohibits only on base political speech and discriminates against no one person or party. It applies to all with no discretionary judgment in the hands of the commanding officer.

Though I recognize Captain Frame's order is a blanket prohibition it does not alter my position. I am not swayed by other precedents which do not speak to the precise point at issue here.[8]

*Housing Areas and Access Road*

As to the housing areas I encounter a more complex situation which requires a separate factual analysis. The captain chose to strictly control access by the public to the internal station but he did not do this to the housing areas, thus leaving for consideration the effect such relinquishment has on further command power in relation to First Amendment rights.

In the case at bar it is indisputable that "some constitutionally protected interest"—plaintiffs' First Amendment rights—are involved. Having taken the position as to a "closed post" articulated, supra, as to other areas I look to subsequent decisions which make it clear that *Cafeteria Workers'* standard of review does not necessarily apply where a First Amendment claim is made. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), struck down as overbroad a security regulation applied to "defense facilities" where the First Amendment freedom of association was infringed. See also Kiiskila v. Nichols, 433 F.2d 745 (7th Cir. 1970).

Likewise it is obvious that the security and military discipline interests which the government has in a military base render the base different from a company town, etc. as was discussed before.

The extent to which a court will interfere with a base commander's authority in order to protect First Amendment rights I conclude depends upon an analysis of the factual situation of each case. It depends, inter alia, on the extent of assertion of control by the military commandant, a question necessarily of degrees of control, as recognized by Justice Blackmun, dissenting in *Flower*.

The facts of the case at bar as to the housing area are that the commandant has largely relinquished his control. True it is still exercised there by granting or denying permission to carry on *commercial* activities, however, the streets and sidewalks are completely open to the public. The Court observed on its view that one of the streets is the access road to the town boat docks and is freely used by town residents.

The restriction on plaintiffs' political activities as applied in the housing areas prevents plaintiffs from reaching the dependent wives or husbands and the children of military personnel at their off post homes.

■ As to defendant Frame's restrictions on commercial activities within the housing areas, the restrictions on such activities involves neither the denial of any constitutional right nor the exercise of a peculiarly military authority. Commercial speech is not protected by the First Amendment, see Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), so these restrictions on commercial activities involve no submission of otherwise constitutionally protected activities to military authori-

---

8. Schneider v. Laird, 453 F.2d 345 (10th Cir. 1972), cert. den. 407 U.S. 914, 92 S.Ct. 2436, 32 L.Ed.2d 690 upholding the authority of a base commander to exclude on base distribution of a publication found to present a danger to the loyalty, discipline or morale of the troops. See also Bridges v. Davis, 311 F.Supp. 935 (D.Hawaii 1969) aff'd 443 F.2d 970 (9th Cir. 1971) reh. den. 445 F.2d 1401, cert. den. 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789; Weissman v. United States, 387 F.2d 271 (10th Cir. 1967); Dash v. Commanding General, Fort Jackson, South Carolina, 307 F.Supp. 849 (D.S.C.1969) aff'd 429 F.2d 427 (4 Cir.), cert. den. 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333.

ty. Civilian civic authorities also restrict commercial activity in residential areas, so in this respect, Captain Frame acts little differently than does a mayor.

█ In light of this factual situation, the Court is not free to bind plaintiffs' First Amendment claim to a deferential review of these military regulations for arbitrariness or capriciousness. Rather the First Amendment commands that in this factual setting the Court examine the competing interests at stake here. True it may be that there is a lesser protection for First Amendment rights in military contexts than in civilian contexts. But this does not mean that military authority is a talisman which vanquishes any right granted by the Constitution to plaintiffs, to military dependents, and to military personnel.

The interests asserted by the Navy here appear to be the maintenance of security, the need for military discipline, and the requirement of political neutrality of the military. As to the interests in security, these restrictions on free speech in the open housing area cannot be justified by the base's security requirements. This is more especially so since the plaintiffs have alleged that they are willing to submit to reasonable regulation as to time, place, and manner of their exercise of speech.

As to the need for discipline, it is doubtful that this interest can be justified strongly in terms of the wives or husbands and children of Navy personnel. As to the personnel themselves, it is a tenuous argument to suggest that they will be less disciplined because of contact with plaintiff's political ideas in the housing areas. The Navy has urged its personnel to become informed in political affairs, to intelligently exercise the franchise. There is no indication that defendants' restrictions are based on a desire to forestall criticism of and loss of respect for ranking Navy officers. On the contrary, political speech contained on the radio, on television, in newspapers, and in magazines, is freely allowed, and personnel are urged to obtain such information. There can be, at most, a minimal interest in protecting military discipline by this blanket prohibition. Rather, the contrary could be argued in light of the Nuremburg trials and the My-Lai incident, which impose a responsibility on military personnel to view their orders in light of a larger concept of legality.

Perhaps the most important of the interests asserted is the preservation of civilian supremacy over the military through the requirement that the military officer remain politically neutral. "The doctrine of civilian supremacy requires that 'the military officer must remain neutral politically' to insure that officers concentrate on the execution of policy rather than the seizure of power. For that reason, restraints upon the freedom of senior officers to speak publicly in opposition to national policies make compelling good sense." See Wulf, Commentary: A Soldier's First Amendment Rights: The Act of Formally Granting and Practically Suppressing, 18 Wayne L.Rev. 667, 679 (1972). However, military command function of officers in the execution of military policy is not significantly in play during off duty hours in the off post homes and housing areas of subordinate military personnel.

It must be concluded that by allowing the general public onto the access road and housing areas, defendant has established that he has no meaningful military interests in these areas. See National Prisoner Reform Association v. Sharkey, CA 4884 (D.R.I. April 28, 1972). The interests of military discipline and political neutrality receive minimal assistance from the restriction on political speech in these areas. As to the housing areas and access road plaintiffs may exercise their First Amendment rights subject to reasonable regulation as to time, place, and manner. Thus applied and to this extent plaintiffs motion for Summary Judgment on the restriction to the housing areas and access road is granted.

The area of Quonset within the perimeter fence the commander has chosen not to open it to the public. For reasons set forth, supra, as to such areas, the restriction on political speech is constitutional and to this extent the defendants motion for summary judgment on the restriction within the perimeter fence is granted.

Counsel shall prepare an order reflecting this ruling.

## SUPPLEMENTAL OPINION

This case involves the rights of minority political party members to enter a military base with political speech and pamphlets. On August 10, 1972, this Court issued an opinion on plaintiffs' motion for summary judgment, allowing plaintiffs access to military housing areas that are outside the perimeter fence which surrounds Quonset Point Naval Air Station, and denying plaintiffs access to the area within the fence. Judgment has not been entered on that opinion; plaintiffs moved for reconsideration on the basis that there were further facts, the consideration of which would lead to judgment in their favor. Based on plaintiffs' offer of proof in support of their motion for reconsideration, this Court held an evidentiary hearing. As a result of this hearing, the Court makes further findings of fact and files this supplemental opinion.[1]

*Findings of Fact—Supplemental*

Plaintiffs have been denied access to the base because the Commander felt that to do otherwise would violate DoD Directive 5410.18, which states:

"Department of Defense participation and cooperation must not directly or indirectly (a) endorse or selectively benefit or favor, or appear to endorse or selectively favor, any . . . political group or (b) be associated with solicitation of votes in a political election."

On August 13, 1972 Vice-President Agnew landed at Quonset Point Naval Air Station on route to a Republican fund-raising dinner at Newport, Rhode Island, to further his own campaign and that of other Republicans. No other reasons have been shown for the Vice-President's appearance at Quonset other than as part of his campaign trip. Prior to August 13, 1972, the Vice-President's staff notified the Commander of Mr. Agnew's intention to land at Quonset and asked the Commander to make arrangements for Mr. Agnew to meet the Republican candidates for United States Senator, Governor and Attorney General from Rhode Island when his plane landed. The Vice-President's staff stated that the press should not be excluded from the base. The Commander, who had this Court's opinion on August 10, was worried about the sensitive nature of the Vice-President's request and so consulted with his commanding officer, Admiral Tibbits. Admiral Tibbits took the matter up the chain of command and finally told Captain Forbes that the matter was resolved. By "resolved" apparently it was meant or assumed that the Vice-President had been briefed on the DoD Directive.

Arrangements were made for the Republican candidates and their families and some of their staff to enter the Station on August 13, 1972 to meet the Vice-President. The Commander granted requests from local and national newspapers and television to cover the Vice-President's activities. Arrangements were made for the press to enter and have access to the Vice-President. No prohibitions were placed on the type of questions which might be asked, nor were the press told of the DoD Directive.

The Commander arranged for the executive officers at Quonset to be present and to meet the Vice-President. A limited number of the base's personnel and their dependents saw the Vice-President by virtue of special passes. The Com-

1. The original defendant Captain R. W. Frame has been succeeded by Captain D. C. Forbes. Substitution has been made under the provisions of Rule 25(d) (1), Fed.R.Civ.P.

mander made no public announcement of the visit.

When the Vice-President emerged from his plane, he greeted his fellow Republican candidates in full view of the assembled spectators and press. He then greeted the Station's executive officers and shook hands with spectators. An impromptu press conference was held and lasted from ten to fifteen minutes. Then, the Vice-President left by military helicopter for the Newport dinner.

At the press conference Mr. Agnew, in response to questions, criticized the Democratic Vice-Presidential candidate and criticized former Attorney General Ramsey Clark for his recent visit to North Vietnam. The media fully reported both the details of the Vice-President's visit and the press conference.

In addition to the three state Republican candidates and some of their staff, the State Chairman of the Republican Party was present when the Vice-President arrived.

In the opinion of the Commander, the activities of the Vice-President while at the Station were not in violation of DoD Directive 5410.18. The Commander had authority to, but did not, exclude the press, other candidates and their staff from the base.

I do not make any further findings of fact on which plaintiffs have offered evidence, resting, instead, on the above.

*Conclusions of Law*

In my opinion of August 10, I found that the area of Quonset Point within the perimeter fence was a strictly closed post, and access to it was subject to the commander's control, save for judicial review for arbitrariness and capriciousness. On page 95, I stated:

"I can only conclude that the directive is in no way arbitrary, capricious or discriminatory as a security meas-ure to safeguard military interest, and as to its application it prohibits only on base political speech and discriminates against no one person or party. It applies to all with no discretionary judgment in the hands of the commanding officer."

The further facts developed in the present evidentiary hearing mandate that I reverse my earlier opinion and find the injunction should issue.

First, the facts simply do not support an interpretation that the Vice-President's visit to Quonset was an official visit. The nature of his request to the Commander and of his activities on the base were political. The Vice-President was in Rhode Island solely and exclusively to attend a fund-raising dinner for his party in Newport. He was ferried from Quonset directly to this dinner by military helicopter.

As is apparent from the facts, the prohibition on political activities derived from DoD Directive 5410.18 has not been applied uniformly and equally to all political candidates and their supporters. The incumbent candidate for vice-president was exempted from the prohibition as were three Republican candidates in the state of Rhode Island, incumbent or not. The vice-presidential candidate, on his way to a partisan political dinner, gave a partisan political press conference, attended, at his request, by the other Republican candidates, on the confines of the Air Station. The Vice-President and Republican candidates from Rhode Island were allowed to enter the Station in spite of the alert as to the "sensitive nature" of the situation. No lesser an authority than the Department of Defense in Washington, D. C. nevertheless flashed a green light with the cryptic comment the situation had been "resolved," without any prohibition of the press or state candidates.[2] Station personnel and de-

2. The evidence in this case includes excerpts from the Log of the Chief of Naval Information, dated 11 August 1972, time: 1800, "First calls on Quonset, R. I. Affair":

"Major Anderson (Directorate of Defense Information) Duty Officer says; (Office of Assistant Secretary of Defense for Public Affairs) has cognizance, action and conn (control) on

pendents were allowed to see the Vice-President. The instances of defendants directly or indirectly selectively benefiting and favoring and appearing to selectively benefit and favor these Republican candidates during their campaign make a mockery of the mandate of the DoD Directive.

This incident constitutes a waiver of the argument that a significant security interest supports the prohibition on political speech. The Commander felt that there was no threat to the security of the base in allowing entry to four Republican candidates. It must follow that there is no security threat in allowing entry to two minority party candidates and their workers.

■ In light of the Agnew incident, it is obvious that there is a constitutionally impermissible area of discretion in the Department of Defense personnel. Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). Furthermore, the refusal to allow plaintiffs on base, in light of the visit of the Republican candidates, was arbitrary and capricious. The arbitrariness of the decision to admit some and exclude others undercuts the asserted purpose of the prohibition: the political neutrality of the military. See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (J. Brennan, concurring).

■ The Agnew visit poignantly emphasizes the validity of plaintiffs' argument that they, as minority party members, are denied access to channels of communication available to the two major parties, richer in resources of wealth, connections, and prestige. They must, plaintiffs argue, rely on face to face campaigning. Yet defendants would deny them even this morsel of campaign techniques, while making it available to major party candidates who need it less. The First Amendment does not allow the hypocrisy of defendants' "political neu-

trality" to continue to penalize plaintiffs. As the Third Circuit Court of Appeals stated in Spock v. David, 469 F.2d 1047 (1972):

"What [military] voters are protected from, practically speaking, is exposure to the political ideas of those minor candidates whose campaigns are neither prominent enough nor sufficiently well-financed to attract media-coverage, and who must make do with the more old fashioned face-to-face style of campaigning. Such a feigned neutrality serves no discernible military purpose, and cannot outweigh the first amendment rights of the minor candidates."

First Amendment rights are given a preferred position. Any meaningful military interest in enforcing the prohibition against plaintiffs has either been waived, or, in reality, just does not exist. The government has failed to show any compelling interest which could justify the prohibition against plaintiffs.

Obviously, the Commander realized the political overtones of the Agnew visit. Why else discuss it with Admiral Tibbits? He was told by the Department of Defense that the issue was "resolved." It appears to this Court that the "resolution" was to assist the campaigns of the Republican vice-presidential and other candidates, and the Department of Defense was far from engaging in political neutrality.

■■ Plaintiffs have also been deprived of the equal protection of the law. Whatever the right of a base commander of a "closed" installation to deny access to the base to all political speakers or candidates, once he has granted access to one group of political speakers or candidates, he cannot then deny access to these plaintiffs, candidates of minority political parties who seek to exercise their fundamental First Amendment rights. Cf. Boddie v. Connecticut, 401 U.S. 371,

entire Agnew Affair. General Hill (Head Directorate Defense Information) has been informed, as has Jerry Friedheim. They will handle matter.

(Admiral) Tibbets (Staff Duty Officer) has been so notified. (Judge Advocate General Duty Officer) in Washington has been notified."

91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Plaintiffs are in a situation not dissimilar to that of the poor in this society:

> "One is poor not because he has no money, but because, possibly owing to lack of money, *he lacks also access to the social instrumentalities that make humanly significant action possible. In part, it is a simple matter of not having the price of admission.*" (emphasis added)

Haworth, "Deprivation and the Good City," Power, Poverty, and Urban Policy, 27, 39 (W. Bloomberg & H. Schmandt eds. 1968), quoted in Michaelman, Foreword: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L. Rev. 7 (1969). If Quonset Point is viewed as a governmentally controlled forum, then both the First and Fourteenth Amendments require that access to the Point be regulated in a manner that is neutral as to the content of the ideas sought to be expressed. Unequal burdens may not be placed on minority groups. Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

There are no constitutionally permissible distinctions that may be drawn between plaintiffs and the Republican candidates that would justify this discrimination against plaintiffs. It is impermissible to base the discrimination on their minority group status. Williams v. Rhodes, *supra*. It is impermissible to base the discrimination on the presumed content of their speech. Police Department of the City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). There is no showing that plaintiffs' speech is not reasonably related to the use to which the base is put; indeed, it might well be argued that plaintiffs' speech was more reasonably related than were the speech and activity of the Republican candidates. See Lloyd Corp. Ltd. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); Unemployed Workers Union v. Hackett, 332 F.Supp. 1372 (D.R.I.1971). As has been said, this Court finds that the appearance of the Vice-President at the Point was not in his official capacity, but in his capacity as a candidate. In any event, Republican candidates were given access who are not incumbents and so could not have been appearing in an official capacity. Plaintiffs and the Republican candidates belong to the same class for constitutional purposes under the Equal Protection clause, and plaintiffs may not be discriminated against.

While this Court appreciates the sensitive position in which the Commander found himself, it feels that the opinion of August 10, 1972 put the Commander on notice that the DoD Directive had to be applied uniformly to all. The Court recognizes that Commander Forbes was caught in a nearly impossible situation, caught in a vise between the approval of the visit by his superiors and the influence of that visit on this lawsuit. The Department of Defense has no one to blame but itself for the outcome of this lawsuit. If it said "No" to Dr. Spock's and Linda Jenness' request, then it should have said "No" to the request of the Vice-Presidential candidate. Essential fairness as well as constitutional mandate demanded that much.

The injunction sought by plaintiffs shall issue. Stay of the injunction pending appeal is denied.

## JUDGMENT

The Court having fully considered all briefs and arguments in this case, the stipulations of fact and evidence produced at hearing, the opinions of August 10, 1972, and November 2, 1972, and findings of fact and conclusions of law contained therein, it is hereby

Ordered, Adjudged, and Decreed that:

Defendants are enjoined from prohibiting plaintiffs from entering Quonset Point Naval Air Station, including those areas within the perimeter fence and those areas outside the perimeter fence, to distribute campaign literature, to discuss the campaign, and to hold a campaign meeting. The right of plaintiffs to enter the base is subject to reasonable regulation as to time, place and manner of their campaign activities.