John KELLAM and Ann Kellam

v.

James BURNLEY, Acting Secretary for the United States Department of Transportation, Officer Scott Lavellee, United States Coast Guard Lieutenant Paul Cormier, United States Coast Guard, and Captain D.S. Jensen, United States Coast Guard.

Civ. A. No. 87–0531 P.

United States District Court,
D. Rhode Island.

Oct. 21, 1987.

Stephen J. Fortunato, Jr., Providence, R.I., for plaintiffs.

Everett C. Sammartiono, Asst. U.S. Atty., Providence, R.I., for defendants.

### OPINION AND ORDER

PETTINE, Senior District Judge.

### I. INTRODUCTION

General Dynamics Corporation supplies defense-related products to the United

States government. Electric Boat Company is a division of General Dynamics and maintains a manufacturing plant on Narragansett Bay in North Kingston, Rhode Island.

On August 6, 1987, an anniversary of the Hiroshima bombing, John and Ann Kellam, Rhode Island residents, anchored their cutter-rigged sailboat, adorned with flags and banners protesting nuclear armaments, approximately one-hundred yards from Electric Boat's coastal property. They were promptly instructed by the captain of a Coast Guard patrol ship that they were within a "restricted area" and ordered, on pain of arrest, to remove their vessel to a distance of five-hundred yards. The Kellams complied.

Several days passed before the Kellams learned from a Guard Lieutenant that while there was a provision in the law by which the Captain of the Port could declare an area a "security zone" and restrict access, no such official action had been taken. Rather, as the Lieutenant understood it, the Coast Guard was enforcing such a zone as a favor to Electric Boat until official action establishing a zone was completed. Surprised, and understandably dissatisfied, the Kellams asked the Lieutenant if they could repeat their peaceful vigil in the future. They were assured that if they did and if Electric Boat didn't like it, a Coast Guard vessel would be dispatched post haste and a "temporary security zone" would be established and the Kellams would again be ordered to depart.

Several weeks after this exchange, the Kellams returned to their location. They discovered, contrary to what they naturally expected, several vessels sailing freely within the so-called "security zone". They also observed bathers sunning on the shoreline abutting Electric Boat's plant.

October 24th is the anniversary of the Cuban Missile Crisis. The Kellams seek to repeat their sail one-hundred yards from the coast. The Captain of the Port, however, has now, allegedly pursuant to the power conferred to him by 33 CFR 6.04–6,

declared the waters extending five-hundred yards from Electric Boat's property a "security zone" between the hours of 12:01 a.m. and 11:59 p.m. of October 24th. This action apparently resulted from a letter request from the security personnel of Electric Boat, which informed the captain that "(t)his security zone is imperative for the prevention of movement of vessels by dissident groups in order to avert accidents, sabotage, or other subversive acts from occuring at this facility, which is a United States Defense Plant".[1]

The Kellams now seek a temporary restraining order preventing the Coast Guard from enforcing the restriction against them on October 24th. They argue that the Coast Guard has no authority to impose such a restriction. They also contend that even if the Guard does have the authority, it is being exercised in such a manner that their first amendment rights are violated.

## II. DISCUSSION

The standard to be applied to determine whether to issue a temporary restraining order is identical to the standard applied for preliminary injunctions. *Palmigiano v. Travisono*, 317 F.Supp. 776, 787 (D.R.I. 1970).

> In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted. (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*LeBeau v. Spirito*, 703 F.2d 639, 642 (1st Cir.1983).

### A. *The Authority of the Captain of the Port*

Plaintiff's first argument, that the Captain of the Port has not been delegated

1. Letter from James R. Gulluscio, Manager of Plant Protection, General Dynamics, to Captain D.S. Jensen, U.S. Coast Guard (October 15, 1987).

authority to restrict an area as a "security zone", can be disposed of summarily.

Under 50 U.S.C. § 191 the President of the United States has the authority "to institute such measures and issue such rules and regulations ...

> to safeguard against destruction, loss, or injury from sabotage or other subversive acts, accidents or other causes of similar nature, vessels, harbors, ports, and waterfront facilities in the United States and all territory and water, continental or insular, subject to the jurisdiction of the United States."

Pursuant to this grant of power President Johnson issued Executive Order No. 11249 on October 13, 1965 whereby Part 6, Subchapter A, Chapter I, Title 33 of the Code of Federal Regulations was amended to permit the Captain of the Port under 33 C.F.R. § 6.04–6 "to establish security zones subject to the terms and conditions specified in (33 C.F.R.) § 6.01–5." Section 6.01–5, also amended by this Order, restricts this authority to establish a security zone to cases in which he deems it "necessary to prevent damage or injury to any vessel or waterfront facility, to safeguard ports, harbors, territories, or waters of the United States or to secure the observance of the rights and obligations of the United States."

█ In the case at bar the Captain of the Port has exercised his rule-making authority pursuant to 33 C.F.R. §§ 6.01–5 and 6.04–6 to establish a security zone. One question before this court, therefore, is whether the Captain of the Port properly invoked §§ 6.01–5 and 6.04–6. Two predicates are necessary before the Captain of the Port may promulgate rules and regulations pursuant to §§ 6.01–5 and 6.04–6. First, the threatened harm must stem "from sabotage or other subversive acts, accidents, or other causes of similar nature". 50 U.S.C. § 191. Second, the Captain of the Port must deem it necessary "to prevent damage or injury to any vessel or waterfront facility, to safeguard ports, harbors, territories, or waters of the United States or to secure the observance of the rights and obligations of the United

States." 33 C.F.R. § 6.01–5. With respect to the first predicate, this court agrees with the reasoning of Judge Friendly that at the very least a boatload of protesters threatens accidental harm. See *U.S. v. Aarons*, 310 F.2d 341, 344 (2d Cir.1962). With respect to the second predicate, this court can only acknowledge that the Captain of the Port did deem it necessary and that "(c)ourts should not second-guess the executive in such matters when there is no indication that the action taken was anything but a good faith effort to protect property deemed essential to the interests of the United States." Id. at 344–45. Accordingly, this court finds that the Captain of the Port did not act *ultra vires* in promulgating a rule pursuant to 33 C.F.R. §§ 6.01–5 and 6.04–6. Nor is the rule promulgated defective under 5 U.S.C. § 553 for failure to give general notice or to publish thirty days prior to its effective date. The Captain of the Port has claimed the good cause exemptions of § 553(b)(B) and (d)(3) to the notice requirement of § 553(b) and to the publication requirement of § 553(d) respectively. As with matters covered by 33 C.F.R. § 6.01–5, this court must give proper deference to the Captain of the Port when he determines that good cause exists under § 553(b)(B) and (d)(3). That the Captain of the Port did not promulgate the rule *ultra vires* and that the rule is not defective under the requirements of the Administrative Procedure Act, however, does not mean that this rule is immune from attack. In particular plaintiffs assert that this rule is violative of their rights under the first amendment. Accordingly, whether this rule constitutes an unconstitutional infringement of plaintiffs' first amendment rights will be considered next.

### B. *The First Amendment Claim*

The question whether the plaintiff will suffer irreparable injury if the restraining order is not granted blends with the substantive merits of the plaintiff's first amendment claim. While certainly it is true that "(a)ny significant denigration of First Amendment rights constitutes irreparable harm." *Westinghouse Broadcasting*

*Co., Inc. v. Dukakis,* 409 F.Supp. 895, 896 (D.Mass.1976), it must be determined, as an initial matter, whether the restrictions imposed actually affect the plaintiff's right to speak.

The imposition of a "security zone" is not, facially at least, directed at curtailing the Kellams' expressive activity. It is not, in other words, a frontal attack on speech, restricting only those vessels bearing flags or banners; it applies to all craft, adorned and unadorned alike. But the Constitution's protection is not limited to direct interference with fundamental rights. *Healy v. James,* 408 U.S. 169, 183, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972). Subtle interference, as well as frontal attack, is equally disfavored. *Id.* "The Constitution would be porous armour, indeed, if the sovereign could accomplish by indirection what it is purportedly barred from doing outright." *R.I. Chap. of Nat. Women's Pol. Caucus v. R.I. Lottery,* 609 F.Supp. 1403, 1412 (D.R.I.1985) (Selya, J.).

The "security zone" would restrict access to the Kellams to five-hundred yards. Their banners and flags, barely visible to coastal observers at one-hundred yards, would be imperceptible at five times that distance. Permitting the Kellams to speak but removing them from their intended listeners is an impermissible compromise. A regulation that impairs one's ability to convey one's message to a desired audience effectively abridges speech. *See Martin v. Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943). I conclude that the Captain's regulation does impinge upon the Kellam's first amendment rights and that the requisite "irreparable injury" criterion is satisfied. *See Dukakis, supra.*

Plaintiffs must also demonstrate likely success on the merits of their first amendment claim. This is not shown merely by the conclusion that the regulation affects their speech rights. The First Amendment "does not guarantee the right to communicate one's views at all times and places or in any conceivable manner." *Duffy v. Quattrocchi,* 576 F.Supp. 336, 339 (D.R.I. 1983). The question is whether the plaintiffs will be able to demonstrate that the restriction is a constitutionally unacceptable one.

It is undisputed, of course, that the Navigable waters adjoining Electric Boat's property are owned and controlled by the United States Government. But this alone does not guarantee access. *U.S. Postal Serv. v. Council of Greenburgh,* 453 U.S. 114, 128–30, 101 S.Ct. 2676, 2684–85, 69 L.Ed.2d 517 (1981). The Supreme Court has adopted a "forum analysis for determining when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The extent to which the government can control access to a particular area depends upon the nature of the relevant forum. *Id.* In places "which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). The government's power to restrict access to public property "which is not by tradition or designation a forum for public communication" is far more liberal. *Id.* at 47, 103 S.Ct. 948 at 955.

Research has not disclosed any cases on the question whether coastal waters, such as ports, harbors or bays, are public fora for first amendment purposes. If I had to decide the matter, however, I believe compelling arguments could be made that such places so resemble traditional public fora, such as public thoroughfares, that a compelling interest would be required to restrict access; a regatta and a parade, as I see it, differ only in that the participants of the former are likely to wear life jackets.

■ It is unnecessary, however, to determine the forum status of the property in question. I conclude that even under the most liberal test employed to test nonpublic forum restrictions, the regulation by the Captain of the Port, as applied to the Kel-

lams, is a constitutionally impermissible restriction of speech.

While restrictions on access to nonpublic forums are less limited than those applying to public forums, they are not limitless.

In *Jenness v. Forbes*, 351 F.Supp. 88 (D.R.I.1972), the presidential candidate for a minor political party sought to gain access to the Quonset Point Naval Air Station to distribute campaign leaflets and to hold meetings. The Commander of the Station denied the request, stating that the Department of Defense was prohibited, by its own policy, from participating in any activity that favors any political group.

This court held that while a military installation is a uniquely nonpublic forum and the Commander of the Station was entitled to substantial deference, entertaining the petitioner's first amendment claim required some review of the Commander's decision. Accordingly, it was held that the Commander's order "denying the plaintiff's request to distribute campaign literature and permission to address voters therein is valid unless applied arbitrarily or capriciously." *Id.* at 95.

At the heart of the *Jenness* case was an endeavor to ensure that the Commander was not prohibiting access merely because he disagreed with the candidate's views. As the Supreme Court recently stated in *Perry, supra,* restrictions on access to nonpublic forums will be tolerated "as long as the regulation ... is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view." 460 U.S. at 47, 103 S.Ct. at 956; *see also U.S. Postal Service v. Council of Greenburgh,* 453 U.S. 114, 133, 101 S.Ct. 2676, 2687, 69 L.Ed.2d 517 (1981).

Here, the Captain of the Port seeks to prohibit a couple from sailing what is in effect a floating billboard one-hundred yards from the coast. He argues that the five-hundred yard restriction is necessary to prevent vandalism to Electric Boat's facilities. He does not contend that the Kel-

lams would attempt destruction, but infers such a potentiality from two instances of nocturnal vandalism by unknown intruders that occurred over two years ago. He further argues that the five-hundred yard restriction is necessary because any closer would enable the Kellams or others to dash ashore before any Coast Guard vessel could reach them.

While the Captain describes a constant and pervasive security threat in letting vessels come within five-hundred yards of the plant at any time, the one-day order seems completely and suspiciously unrelated to this threat. The Captain could not offer any reasons why he felt that no similar security risk existed the day before or the day after October 24th, or for that matter on any day but October 24th. The imposition of the regulation, designed, as it is, to take effect on the very day the Kellams plan their peaceful vigil and to expire immediately thereafter, more than lightly suggests that the Captain was motivated, not by some perceived security risk, but by the fact that he, along with the security personnel at Electric Boat, opposes the Kellams view.

Further, the Captain alleges that the five-hundred yard distance is required for effective policing of the area. It is argued that permitting the Kellams to moor their boat at the one-hundred yard mark would require the employment of numerous Coast Guard vessels at great expense to taxpayers to ensure that the Kellams do not bolt for the shore. The fallacy of this justification, however, is that one or two well-placed officers on the coast could just as effectively prevent such an occurrence, and at a substantial savings in cost.

## III. CONCLUSION

For the foregoing reasons, I conclude that the Captain's enforcement of the regulation against the Kellams is an arbitrary and capricious use of a regulation to suppress views with which he disagrees.[2] I

---

**2.** I am not moved to a contrary conclusion by *U.S. v. Aarons,* 310 F.2d 341 (2d Cir.1962). There, a Polaris submarine was being launched into the Thames River. An anti-nuclear group

threatened to "block the launching." A security zone was established for two hours surrounding the area necessary to launch the submarine.

believe that this conclusion is supported also by the prior solicitousness of the Coast Guard to Electric Boat's desire to exclude the Kellams from the area even before the security measure was formally adopted. Accordingly, I hold that the petitioners have demonstrated likely success on the merits in their first amendment claim. I therefore grant the petitioners' restraining order in that the Captain of the Port may not prohibit the Kellams from anchoring their sail boat, named "Peace", at a point no less than one hundred yards from shore during the daylight hours of October 24, 1987. I emphasize that this Order applies only as it relates to the Kellams and their vessel.

The group argued that it had a first amendment right to take action designed to block the submarine. *Id.* at 345. This argument was disposed of by the court in a single paragraph before it moved on, as the court put it, to the "Appellant's serious argument" that the Guard had failed to give notice of the zone. *Id.*

The facts of that case, including the doubtful nature of the first amendment claim and the very real threat of actual interference with the launching of the submarine, are so strikingly dissimilar to those presented here that the case offers little guidance on the first amendment issue.