609 F.Supp. 1403 (1985)
The RHODE ISLAND CHAPTER OF the NATIONAL WOMEN'S POLITICAL CAUCUS, INC., et al., Plaintiffs,
v.
The RHODE ISLAND LOTTERY COMMISSION, et al., Defendants.
C.A. No. 84-0284 S.
United States District Court, D. Rhode Island.
May 22, 1985.
*1404 *1405 Roney & Labinger, Lynette Labinger, Providence, R.I., for plaintiffs.
Arlene Violet, Atty. Gen., Thomas H. Caruolo, Spec. Ass't. Atty. Gen., Hawkins & Hoopis, John P. Hawkins, Providence, R.I., for defendants.

OPINION
SELYA, District Judge.
This suit has been prosecuted by a trio of plaintiffs: the Rhode Island Chapter of the National Women's Political Caucus, Inc. (RIWPC); the Rhode Island Women's Political Caucus Political Action Committee (PAC); and the Citizens Party of Rhode Island (Citizens Party). RIWPC is a nonprofit association incorporated under Rhode Island law for the purpose of furthering the interests of women. The PAC is an unincorporated committee of RIWPC which, since January of 1984, has carried out RIWPC's fundraising activities with respect to its political ventures. The Citizens Party is an unincorporated association existing under the laws of Rhode Island which styles itself as a political party; it is the state affiliate of the Citizens Party of the United States.
At the core of the controversy lies the constitutionality vel non of a state statute which regulates the conduct of lotteries and games of chance in Rhode Island, to wit, R.I.Gen.Laws § 11-19-1, as amended (1984 Supp.) (the Act). Invoking this court's federal question jurisdiction, 28 U.S.C. §§ 1331, 1343(3), each of these three plaintiffs objects to its alleged exclusion from the perceived benefices of an exception contained in the Act. And, the claimants call into play the anodynes of 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 1983.
The defendants are the Rhode Island State Police (who are charged with enforcing Title 11); the commandant of the state police, Colonel Walter E. Stone; a ranking state police officer, Lieutenant Richard Wheeler; and the state's Attorney General.[1] *1406 (The plaintiffs initially sued the Rhode Island Lottery Commission as well, but the court heretofore dismissed the suit as to the Lottery Commission under Fed.R.Civ.P. 12(b)(6). See Amended Order entered September 17, 1984. The rationale for that dismissal is not applicable to the remaining defendants.)
The case is presently before the court on the plaintiffs' motion for partial summary judgment, Fed.R.Civ.P. 56, and the defendants' cross motion for judgment on the pleadings. Fed.R.Civ.P. 12(c). Oral argument was initially heard on December 27, 1984, and the motions taken under advisement. On January 29, 1985, however, this court issued an order requiring the parties to show cause why the court should not abstain pending a state court construction of the challenged statute and/or why questions anent the interpretation of the Act should not be certified to the state supreme court. Following supplemental briefing, the show-cause hearing was held on March 11, 1985. The court again reserved decision, announcing its intention to address all pending matters, to the extent necessary, in a written opinion. This rescript fulfils that commitment.

I. BACKGROUND.
The underlying facts upon which this litigation is premised are essentially uncontested. On or about April 16, 1982, RIWPC requested permission from the Rhode Island Lottery Commission and the state police to conduct a raffle culminating in a drawing scheduled to take place on June 27, 1982. At the time of that application, R.I.Gen.Laws § 11-19-1 prohibited all persons "not authorized by the Rhode Island State Police" from conducting lotteries or games of chance, except that various committees "elected pursuant to the provisions of title 17, as amended [of the Rhode Island General Laws]" were allowed to conduct a twenty week club or a raffle once a year. RIWPC's request was denied on the ground that it was not a group empowered to dabble in raffle-rousing pursuant to the statute, and did not otherwise come within the exceptions created by R.I.Gen.Laws § 11-19-30.1 (1982 Supp.). (Under the last-mentioned statute, which has since been recodified as R.I.Gen.Laws § 11-19-30, various civic and fraternal organizations may be allowed to conduct games of chance as long as they are run solely by the members and the proceeds are expended exclusively for charitable purposes.) RIWPC licked its wounds, but took no action to contest this refusal.
In 1983, the escape hatch built into R.I. Gen.Laws § 11-19-1 was further widened to allow certified candidates for political office to conduct a 20-week club or raffle once a year. (The text of the amendment is quoted post at Part III of this opinion.) On or about June 28, 1983, RIWPC again sought permission to stage a raffle, with a drawing to be held on September 15, 1983. Wheeler informed RIWPC on September 14, 1983 that the state police had dishonored the request inasmuch as it did not come within the purview of any legitimatizing statutory exception. RIWPC and the PAC jointly filed this suit on June 7, 1984; the Citizens Party was allowed to intervene on October 15, 1984. The instant motions followed in due course.
The plaintiffs seek brevis disposition as to their claims for declaratory and injunctive relief, asseverating that the state statute, on its face and as applied, comprises an impermissible abridgement of rights secured to them by the first and fourteenth amendments to the federal Constitution. (They pray for only partial summary judgment, as they concede that their damage claims must be litigated separately.) The defendants' motion for judgment on the pleadings presents the flip side of the coin of constitutionality: these movants view *1407 the Act as a wholesome exercise of the state's power and urge that the plaintiffs' challenge be summarily rejected.

II. STANDING.
It is important at the outset to clarify the respective plaintiffs' positions vis-a-vis the statute. Having twice applied for, and been denied, permission to conduct a raffle, RIWPC has plainly suffered injury as a result of the defendants' interpretation and enforcement of the Act. Because this plaintiff "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant[s]," Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); see also Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and because the injury "fairly can be traced to the challenged action," and "is likely to be redressed by a favorable decision," Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758, citing Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976), RIWPC plainly is not a mere interloper; it has standing to bring this suit.[2]
This terrain is not so firm, however, with regard to either the PAC or the Citizens Party. The PAC apparently did not even spring into being until late January, 1984  after both of RIWPC's supplications had been turned away. The PAC has never, on this record, aspired to conduct its own lottery. To be sure, as the present fundraising arm of RIWPC, it might lay claim to being a specie of corporate successor in interest for purposes of this particular controversy. But, the difficulty with this approach, vis-a-vis a standing analysis, is that the exact nature of the relationship between RIWPC and the PAC has not been made entirely clear on this scumbled record. It is, for example, uncertain whether both RIWPC and the PAC intend to engage in future fundraising, or whether RIWPC will simply rely on its PAC to carry out this function. These ambiguities in the PAC's status and anent its relationship to RIWPC render its standing tenebrous.
The court, however, need not delve too deeply into the PAC's standing. The matter can be looked at from another angle. It is beyond cavil that RIWPC and the PAC are identically affected by, and share the same concerns regarding, the Act. Thus, for the plaintiffs' primary litigation purpose, i.e., a declaration that R.I.Gen.Laws § 11-19-1 is unconstitutional and the granting of appropriate injunctive relief ancillary to such a declaration, the two are indistinguishable. Viewed in the light of this identity of interest and commonality of purpose, the finding that RIWPC has standing to sue obviates the need independently to adjudicate whether or not the PAC has standing in its own right. Watt v. Energy Action Educational Foundation, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 562 & n. 9, 50 L.Ed.2d 450 (1977); Fausto v. Diamond, 589 F.Supp. 451, 460 (D.R.I.1984).[3]
Like the PAC, the Citizens Party has never actually applied for permission to conduct a 20-week club or raffle, and so has not suffered direct injury by means of the statute. Yet, in other respects, that plaintiff is situated differently than either *1408 of the others. Though duly constituted as a political party in the state of Rhode Island, it is allegedly excluded from the green pastures within the encincture of R.I.Gen.Laws § 11-19-1 not because of its status or constitution, but because it has fared poorly at the polls. Indeed, the Citizens Party mounts its challenge to the Act primarily on that basis. And, the Citizens Party has asserted in the Local Rule 12.1(a)(1) statement of material facts (Statement) which accompanied its motion for partial summary judgment that it "plans to conduct a raffle forthwith and to conduct raffles hereinafter [sic] on an annual basis." Id. at ¶ 18. The defendants have not put these averments in issue, and they are deemed admitted for purposes of this proceeding. See D.R.I.L.R. 12.1(a)(2), (b). Moreover, the defendants' brief in opposition to the plaintiffs' motion for partial summary judgment unequivocally maintains that the Citizens Party is not entitled to conduct a raffle or other lottery under R.I.Gen.Laws § 11-19-1. The state's attorney general having taken so rigid and inflexible a position, it is virtually a foregone conclusion that any attempt by the Citizens Party to conduct its planned raffle would result in the institution of a criminal prosecution against it.
The axe that is so plainly poised over the party's head renders its suit justiciable. "When contesting the constitutionality of a criminal statute, `it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" Babbit v. United Farm Workers National Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), quoting Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). Since the Citizens Party clearly seeks "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, `[it] should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" Babbit, 442 U.S. at 298, 99 S.Ct. at 2308, quoting Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). On this basis, the Citizens Party's request for declaratory and injunctive relief seems properly before the court.

III. THE SHOW-CAUSE ORDER.
The challenged statute, R.I.Gen.Laws § 11-19-1, as amended, purports to proscribe lotteries and games of chance generally, see n. 8 post, but contains the following exception:
Provided, however, That any state, city, town, ward or district committee elected pursuant to the provisions of title 17, or certified candidates, but not both, as defined in title 17, shall be allowed to conduct that lottery commonly known as a "twenty (20) week club" or conduct a raffle once within a twelve-month period subsequent to notification to the Rhode Island Lottery Commission. For the purposes of this section a certified candidate shall not include any state, city, town, ward or district committee person.
It is this exception which is the cynosure of the instant litigation.
This court has been, and remains, troubled by the amphibolous verbiage used by the Rhode Island General Assembly to define the excepted class. The literal language reads that "any state, city, town, ward or district committee elected pursuant to the provisions of title 17" may be allowed to conduct a lottery or raffle. (Title 17 of the Rhode Island General Laws is a twenty-five chapter regulatory scheme governing all aspects of the electoral process in Rhode Island; chapter 12 contains the guidelines pertaining to the state, city, town, ward and district committee, including their composition and constitution.) Several clauses later, however, the statute contains the additional proviso "as defined in title 17".
Under the rule of the last antecedent, qualifying phrases are to be applied to the words or phrase immediately preceding and are not to be considered as extending to *1409 others more remote. United States v. Ven-Fuel, Inc., 758 F.2d 741, 751 (1st Cir. 1985); First Charter Financial Corp. v. United States, 669 F.2d 1342, 1350 (9th Cir.1982); Azure v. Morton, 514 F.2d 897, 900 (9th Cir.1975); Quindlen v. Prudential Insurance Co., 482 F.2d 876, 878 (5th Cir.1973); United States v. Pritchett, 470 F.2d 455, 459 (D.C.Cir.1972). While the rule is not an inflexible one, Ven-Fuel, at 751; Pritchett, 470 F.2d at 459, it should be employed unless there is a plain indication to the contrary in the statute. In this instance, however, the phrase preceding the last antecedent is "but not both," which cannot be read sensibly with "as defined in title 17." The words "certified candidates," which precede "but not both," may be read in conjunction with the modifying "as defined in title 17." But, title 17 does not explicitly define "certified candidates," see R.I.Gen.Laws § 17-1-2, although it does establish the procedure by which they may be certified. See R.I.Gen.Laws §§ 17-17-1 et seq.
Still leapfrogging backwards, the phrase "as defined in title 17" could conceivably be applied to the various committees. Though such a construction has some textual coherence, it also possesses two flaws. First, title 17 does not contain the definitions of the committees to which the Act alludes, but merely states the procedural guidelines governing their existence. See R.I.Gen. Laws §§ 17-12-1 et seq. Second, it is not clear how the later phrase "as defined in title 17" may be reconciled with the earlier "elected pursuant to the provisions of title 17," in the context of the various enumerated "committees".
It was precisely these concerns which prompted this court to launch its show-cause order of January 29, 1985, described ante. The parties to the litigation, while remaining at swords' points on virtually every other issue pertaining to the interdicted statute, found common ground on this occasion. Both the plaintiffs and the state pleaded that neither abstention nor certification was necessary or desirable in this case, and united to urge upon the court a shared reading of R.I.Gen.Laws § 11-19-1. On the parties' joint interpretation, the Act is construed as though it read that "any state, city, town, ward or district committee [of a political party, as defined in R.I.Gen.Laws § 17-1-2(f) and] elected pursuant to the provisions of title 17, ..." may conduct a 20-week club or raffle. (Under R.I.Gen.Laws § 17-1-2(f), a political party is defined as "any political organization which at the preceding general election nominated a candidate for governor, and whose candidate for governor at said election polled at least five percent (5%) of the entire vote cast in the state for governor.")
On such a construction, RIWPC is excluded from the grace of the exception because it is not an organized political party within the meaning of the Act, and the Citizens Party is excluded because it did not front a gubernatorial candidate who polled 5% or more of the vote in the last general election. The question thus becomes whether the court should persist in pursuing its gnawing doubts about the meaning of a state statute when the adversary parties to the litigation (one of whom is the state's chief legal officer) blithely agree that the law is clear on its face.
Federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided. Hawaii Housing Authority v. Midkiff, ___ U.S. ___, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984); Railroad Commission v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). This prudential precept is part and parcel of the "basic tenet of the federal courts to eschew the decision of cases on constitutional grounds unless and until all other available avenues of resolution [have been] exhausted." Aggarwal v. Ponce School of Medicine, 745 F.2d 723, 726 (1st Cir.1984). In the case at bar, it is not impossible, in this court's view, that the state supreme court would interpret the statute differently than have the parties; if so, the litigants' respective positions under the law would be materially altered. If, *1410 for example, the state court rejected the language which the parties have engrafted upon the Act by implication, and concluded that the criterion for the exception is, in fact, that the committees be elected in the manner prescribed by title 17, the Citizens Party might well qualify for the benefits of the exemption.
On the other hand, the court recognizes that abstention often imposes a substantial cost in delay, expense, and legal uncertainty. See generally Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071, 1085-87 (1974). And, as the Supreme Court has recently emphasized, "the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary." Hawaii Housing Authority, 104 S.Ct. at 2327 (emphasis original). Abstention should not be ordered "unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." Zwickler v. Koota, 389 U.S. 241, 251 n. 14, 88 S.Ct. 391, 397 n. 14, 19 L.Ed.2d 444 (1967). Then, too, engagement of the doctrine has generally been disfavored in first amendment cases, or in situations where civil rights are at imminent risk. E.g., Baggett v. Bullitt, 377 U.S. 360, 375-79, 84 S.Ct. 1316, 1324-27, 12 L.Ed.2d 377 (1964). A federal court should not bury its head in the sand simply because the litigation before it implicates an inartfully-drawn state statute. "There is a point ... at which the possible benefits of abstention become too speculative to justify or require avoidance of the question presented." Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 481, 97 S.Ct. 1898, 1905, 52 L.Ed.2d 513 (1977).
The point of such diminishing returns has been reached in this case. Although a state court interpretation might obviate the need for a federal constitutional decision on the Citizens Party's claim, it is extremely unlikely that there lurks within the interstices of the statute any construction which would bring RIWPC within the exception and thereby eliminate the need for a decision on federal grounds as to that plaintiff. And, the fact that the constitutional questions probably cannot be entirely mooted by any state court construction is reason enough to eschew abstention. E.g., Scheinberg v. Smith, 659 F.2d 476, 481 (5th Cir.1981).
Secondly, no party to the litigation has beseeched the court to abstain; to the contrary, they agree that R.I.Gen.Laws § 11-19-1 prohibits both RIWPC and the Citizens Party from conducting raffles to raise funds and jointly implore the court to shun abstention. That being so, sidestepping would in this instance create a grotesquely misshapen creature: a case ripe for state court adjudication on an issue where the parties are less adversaries than confederates, each urging the selfsame interpretation of the statutory verbiage. Cf. Ciba-Geigy Corp. v. Local # 2548, United Textile Workers of America, AFL-CIO, 391 F.Supp. 287, 297 n. 10 (D.R.I.1975) (abstention disfavored where the parties mutually deplore such a course and where abstention, if imposed unilaterally by the judge, would come at a high price to the litigants).
Thirdly, the defendants are all arms of the state, willing  indeed, as betokened by their response to the show-cause order, eagerto have the matter adjudicated in federal court; there is thus precious little reason to believe that abstention would advance federal-state comity. So, one of the principal rationales for Pullman deference is notably absent in this case. See Professional Plan Examiners of New Jersey, Inc. v. LeFante, 750 F.2d 282, 290-91 (3rd Cir.1984).
Fourth, despite this court's concerns anent the parties' shared construction of R.I.Gen.Laws § 11-19-1 as amended, the statute is so poorly drafted and difficult to read coherently that, perhaps, it can only be salvaged by creative interpretation. The courts have a duty, of course, to give effect to the enactment of a state legislature if that is feasible. See McCown v. Heidler, 527 F.2d 204, 207 (10th Cir.1975); Wilshire Oil Company of California v. *1411 Costello, 348 F.2d 241, 243 (9th Cir.1965); United Nuclear Corp. v. Cannon, 553 F.Supp. 1220, 1233 (D.R.I.1982); cf. United States v. New England Coal & Coke Co., 318 F.2d 138, 142 (1st Cir.1963). And, given the slipshod draftsmanship, the meaning placed upon the statute by the state officials (and echoed by the plaintiffs) may be the best of a sorry batch of choices. Certainly, it cannot be said to comprise an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11, 95 S.Ct. 1881, 1886 n. 11, 44 L.Ed.2d 508 (1975).
Finally, this is an instance in which delay would necessarily be attendant upon abstention, and in which that delay would serve to erode the plaintiffs' rights. General elections occur biennially; off-year local elections are not uncommon in Rhode Island; the causes which RIWPC espouses are an ongoing matter; fundraising is a year-round process; there is, increasingly, no off-season for political campaigning; and all of the parties here are adversely affected by the uncertainty which presently clouds the statute.
This court recognizes that abstention is "the exception, not the rule." Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Seen in the context of the litigation as a whole, abstention appears, on balance, to be tantamount to an unproductive (and perhaps unnecessary) abdication of federal jurisdiction. Cf. Kusper v. Pontikes, 414 U.S. 51, 55, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). And, essentially the same concerns which counsel against abstention militate against certification as well.[4] Though certification may be preferable to abstention in a reasoned choice between the two, see Bellotti v. Baird, 428 U.S. 132, 150-51, 96 S.Ct. 2857, 2867-68, 49 L.Ed.2d 844 (1976), it would, in these straitened circumstances, likely be more deleterious than beneficial. See Moe v. Dinkins, 635 F.2d 1045, 1048 (2d Cir.1980), cert. denied sub nom. Axelrod v. Coe, 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982). Thus, cause has been shown. The court will address the substance of the parties' competing contentions.

IV. THE MERITS.

A. The First Amendment Claim.

RIWPC and the Citizens Party complain that R.I.Gen.Laws § 11-19-1 burdens their first amendment freedoms of expression and association by unfairly restricting their fundraising opportunities. In this instance, a roadblock on a particular fundraising avenue need not be analyzed exclusively in terms of either the right of association or the right of expression. As the Supreme Court has emphasized, "[t]he two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression." Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 300, 102 S.Ct. 434, 439, 70 L.Ed.2d 492 (1981).
The defendants argue that fundraising by means of a raffle is not so linked to the core first amendment activity of communicating ideas that proscribing the right to conduct a raffle itself overburdens the communicative process. But, as the Court has so pointedly noted, freedom of association "is diluted if it does not include the right to pool money through contributions, for funds are often essential if `advocacy' is to be truly or optimally `effective'." Id. at 296, 102 S.Ct. at 437, quoting Buckley v. Valeo, 424 U.S. 1, 65-66, 96 S.Ct. 612, 656-657, 46 L.Ed.2d 659 (1976). On the facts at bar and as the statute operates in the mise-en-scene of Rhode Island politics, there is very little difference between making a formal political contribution and buying *1412 a raffle ticket. Though the possibility of winning a tangible something, sometime, may add a speck of allure to the lottery, both payments are, at bottom, designed to enrich a party's or a candidate's coffers. Furthermore, the very holding of a drawing itself represents an opportunity to publicize the organization's positions. The same sentiments hold true of a 20-week club, but with the further (more compelling) twist that this form of political warchesting mandates sustained contact over several months. In either case, the money raised is obviously important in promoting ideas in the political sector. As another judge in this district has observed in a somewhat analogous matter, "[t]here can be little doubt that fundraising activities such as the charitable raffle involved in this case implicate a variety of speech interests that are within the protection of the First Amendment." Rhode Island American Civil Liberties Union v. Rhode Island Lottery Commission, 553 F.Supp. 752, 768 (D.R.I.1982) (Pettine, J.).
Finally, it must be remembered that "the Constitution's protection is not limited to direct interference with fundamental rights." Healey v. James, 408 U.S. 169, 183, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972). "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." Id. See also Bates v. City of Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). The Constitution would be porous armor, indeed, if the sovereign could accomplish by indirection what it is purportedly barred from doing outright.
As noted above, the plaintiffs are apparently excluded from the exception which the legislature has carved out of the Act, but for somewhat different reasons. RIWPC's exclusion is based on a matter of form. It is an issue-oriented social action organization which occasionally endorses candidates who share its views, but neither RIWPC nor a string of candidates slated under its banner appears on the ballot. Yet, the Supreme Court has only recently "reject[ed] the notion that [a political action committee's] form of organization or method of solicitation diminishes [its] entitlement to First Amendment protection." Federal Election Commission v. National Conservative Political Action Committee, ___ U.S. ___, 105 S.Ct. 1459, 1467, 84 S.Ct. 455 (1985). The Citizens Party, on the other hand, is excluded for operational reasons. It did run candidates for governor and for lieutenant governor in 1982, but those aspirants failed to achieve the five percent of the vote required by R.I.Gen. Laws § 17-1-2(f). And, the party did not field any statewide candidates in the 1984 general elections. Nevertheless, the facts are uncontroverted that the Citizens Party remains an active (if not particularly successful) political entity which continues to meet regularly, take stands on issues, and promote a myriad of candidates for local, state, and national office.
Refined to its barest essence, the state thus conditions the right to conduct this type of fundraising activity on whether a group chooses to adopt a particular form of organization, decides to run a candidate for one particular office, and experiences the happy fortuity of achieving popular electoral support for the candidate (including, by implication, his or her platform). At least one court has found that a regulation which confers benefits on the basis of popularity must be content-based since a finding otherwise "would require the court to draw on [sic] artificial distinction between the popularity and the substance of an idea." Greenberg v. Bolger, 497 F.Supp. 756, 775 (E.D.N.Y.1980). By granting the right to conduct a raffle and/or 20-week club to political parties whose gubernatorial candidates poll at least five percent of the vote (or, in practice and effect, limiting the grant to the Republican and Democratic parties), the state has chosen to benefit those with popular views. The ineluctable result of this paradigm is, of course, further to burden those with unpopular views. To handicap a party's fundraising efforts "because [it] has not achieved a required level of acceptance is not different from *1413 censoring speech because of its substance." Id. at 776. See also Spencer v. Herdesty, 571 F.Supp. 444, 453-54 (S.D.Ohio 1983).
Indeed, one might ask, how is political ideology to be popularized and implemented except by the election of those committed to such views? And, how can a political party or other interested organization ensure a fair run for its candidates if it is cut off by the state from access to sources routinely available to those with more widely accepted platforms?
The state's denial of fundraising opportunities on this basis is particularly unacceptable for it hampers the exercise of first amendment rights by those who could profit the most from an expanded forum. It is precisely those who are least well-known who most desperately require access to means of attracting attention. Hitherto unaccepted or unfashionable views most demand the blare of trumpets to draw the public's consideration. And, clarion calls do not come cheaply. The practice memorialized by the Act is inimical to the diversity which our society fosters. See Sweezy v. New Hampshire, 354 U.S. 234, 251, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). The American song is one best sung by a plurality of voices. As the Supreme Court indicated two decades ago, protecting a minority group's access to public opinion benefits the whole of our society:
All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society.
Id. at 250-51, 77 S.Ct. at 1211-12.
In public forum cases, the rule adopted by the Court is that public areas, activities, or services established by government to serve the purpose of enhancing free expression must be equally available to all ideas. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 555-56, 95 S.Ct. 1239, 1244-45, 43 L.Ed.2d 448 (1975); Police Department of the City of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). See also Greenberg, 497 F.Supp. at 777. Having made the activity available to the Republican and Democratic parties, the state cannot arbitrarily deny it to less successful groups.
The defendants argue, however, that the statute must be understood not as conferring a trouvaille upon the political establishment, but as an effort to control gambling within the state. On this understanding, the issue must be whether the state has exercised its power to regulate gaming in such a manner as not unduly to intrude upon the rights of free speech. "Even a `significant interference with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976), quoting Cousins v. Wigoda, 419 U.S. 477, 488, 95 S.Ct. 541, 548, 42 L.Ed.2d 595 (1975).
There is no question that the Act's primary purpose  namely the control and regulation of gambling  implicates an important and legitimate state interest. If the Act barred all political fundraising which depended on games of chance, the defendants' plea would have compelling force. The difficulty, however, is that the state has created an exception to its policy, an exception which is a two-edged sword: it relaxes the ban against gambling, while at the same time promoting and enhancing the first amendment rights of certain groups over those of others. Both blades cut against the constitutional grain. The proviso can by no stretch of the imagination be thought to be "closely drawn to avoid unnecessary abridgement of associational freedoms." Buckley, 424 U.S. at 25, 96 S.Ct. at 637. Rather, the exception actually undermines the stated purpose of the *1414 Act. While R.I.Gen.Laws § 11-19-1 professes to restrict gambling, the proviso serves no purpose but to allow the two major parties to conduct up to 480 raffles or 20-week clubs per year,[5] as well as permitting each certified political candidate to conduct one for himself or herself. Thus, the 1979 and 1983 amendments to the Actwhich are the source of the present trouble  are actually pro-gambling, not anti-gambling, measures.
Nor can Rhode Island justify the measure in any other way: there is nothing peculiar to the form of the major parties that make them inherently more trustworthy, or reliable, or easier to police, than RIWPC or the Citizens Party. Our national history in this century, from Teapot Dome to Watergate and at several stops in between, has shown conclusively that skulduggery is no respecter of party lines. And the privileges granted by the state to certain not-for-profit organizations in this area, e.g., R.I.Gen.Laws § 11-19-30, bear mute testimony to the fact that state officials could monitor raffles conducted by RIWPC or by the Citizens Party just as easily as those sponsored by Republicans and Democrats. Surely, any needed prophylaxis can be sculpted much more finely than the outright ban on these activities which presently confronts the plaintiffs.
Because the exception which has hamhandedly been shoved into the Act seriously impugns the first amendment rights of minority organizations without necessarily serving the avowed purposes of the regulation in a rational way, it cannot be justified in terms of a compelling or legitimate state interest. And, it follows inexorably that R.I.Gen.Laws § 11-19-1, in its present incarnation, does not pass constitutional muster.

B. The Equal Protection Claim

Since the Act is unconstitutional on first amendment grounds, it is necessarily invalid as it stands; the court, therefore, need not reach the plaintiffs' equal protection claim. Nevertheless, this claim implicates different concerns than those raised by the first amendment challenge; and, a fuller picture is advisable in this case both because the first amendment issue is not free from doubt and because an effort may be mounted legislatively to refashion the statute. Thus, the court perceives its responsibility as being best fulfilled, under these particular circumstances, by tackling, rather than skirting, the equal protection prong of the plaintiffs' assault upon the Act.
RIWPC and the Citizens Party complain that R.I.Gen.Laws § 11-19-1 violates the Equal Protection Clause of the fourteenth amendment, and 42 U.S.C. § 1983, by imposing disparate treatment on similarly situated political bodies solely on the basis of affiliation vel non with one of the major parties. The statute, it should be noted, places no restrictions on how party committees may spend the money they raise by means of the specially-sanctioned gaming. Thus, raffle proceeds may be used for the benefit of candidates, for committee operating expenses, organizational activities other than candidate contributions, recruitment, issue promotion, or generally for the party treasuries. And, while a political committee may not explicitly hold a raffle for a certified candidate who has already conducted or plans to conduct a raffle him/herself, there is nothing to inhibit several committees from holding raffles to benefit one particular candidate. At best, a Citizens Party candidate who has been certified under R.I.Gen.Laws §§ 17-17-1 et seq. may conduct a single raffle to benefit his/her own campaign. This contrasts sharply with the fact that the Republican and Democratic parties can each potentially run no less than 240 raffles per year, see n. 5, ante, for the direct or indirect benefit of that candidate's opponent(s).
*1415 Under traditional equal protection principles applicable in the ordinary case, the state-sponsored distinction "need only be drawn in a manner that bears some rational relationship to a legitimate state end." Clements v. Fashing, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) (Opinion of Rehnquist, J.). The Court has stated that departure from this test is warranted "only when the challenged statute places burdens upon `suspect classes' of persons or on a constitutional right that is deemed to be `fundamental'." Id. It is at least arguable that the constitutional rights here at issue may be "fundamental" in this sense, see text ante at Part IV(A), and that strict scrutiny may therefore be required.
Unfortunately, however, the Supreme Court's recent equal protection decisions, taken in the ensemble, cast eerie shadows over attempts to pinpoint the level of scrutiny required in individual cases. As Justice Stevens characterized the Court's efforts in one plurality opinion,
In cases presenting issues under the Equal Protection Clause, the Court often plunges directly into a discussion of the "level of scrutiny" that will be used to review state action that affects different classes of persons differently. Unfortunately that analysis may do more to obfuscate than to clarify the inquiry.
Clements v. Fashing, 457 U.S. at 973, 102 S.Ct. at 2849 (Stevens, J., concurring in part and concurring in the judgment). By focussing on the level of scrutiny at the threshold, the Court appears gradually to have narrowed the range of circumstances in which strict scrutiny is mandated. See, e.g., Regan v. Taxation with Representation of Washington, 461 U.S. 540, 547-50, 103 S.Ct. 1997, 2001-03, 76 L.Ed.2d 129 (1983); Clements v. Fashing, 457 U.S. at 963-66, 102 S.Ct. at 2843-45 (Opinion of Rehnquist, J.). At the same time, the Court has lately fashioned some kind of intermediate standard of review for certain cases which falls somewhere between the traditional "rational basis" minimum and the strict scrutiny maximum. See, e.g., Buckley v. Valeo, 424 U.S. at 95-96, 96 S.Ct. at 671; Id., at 293, 96 S.Ct. at 761 (Rehnquist, J., concurring and dissenting); American Party of Texas v. White, 415 U.S. 767, 780, 94 S.Ct. 1296, 1305, 39 L.Ed.2d 744 (1974); Storer v. Brown, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974).[6]
The conundrum is all the more puzzling because it is not entirely clear what type of circumstances suffice to trigger either the more compressed understanding of strict scrutiny or the application of an intermediate hybrid standard. An argument may be made that the less significant the legislative interference with a fundamental right, the less deserving it is of strict scrutiny. See Clements v. Fashing, 457 U.S. at 968, 102 S.Ct. at 2846 (Opinion of Rehnquist, J.). Cf. Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 1361-64, 79 L.Ed.2d 604 (1984); Fausto v. Diamond, 589 F.Supp. at 466. In the case at bar, while the exception to R.I.Gen.Laws § 11-19-1 affects the plaintiffs' first amendment rights, it certainly does not bar them from the totality  or even the bulk  of first amendment activities. And in one sense, the Act does not actually restrict first amendment rights at all; it merely confers a first amendment windfall on some groups rather than others. As the Supreme Court recently emphasized, "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." Regan v. Taxation with Representation of Washington, 461 U.S. at 549, 103 S.Ct. at 2002. Accordingly, while this court is mindful that it has already found the statute *1416 invalid on first amendment grounds, it is possible that the manner in which it infringes the first amendment may require something less than strict scrutiny under the Equal Protection Clause.
In the end, however, these intriguing questions may be left to another day. The Act, by any standard, infringes the equal protection rights of at least one of the plaintiffs. Thus, so that the state's best foot may be put forward, the court will employ the method of analysis most hospitable to the defendants and will examine the equal protection adequacy of the Act under the lower magnification glass of the rational relationship test.
The question must then be asked whether the distinction created by the 1979 amendment to R.I.Gen.Laws § 11-19-1 is rationally related to the achievement of a legitimate state purpose. To determine this, the court must answer two questions. "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?" Western & Southern Life Insurance Co. v. State Board of Equalization of California, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981). See also Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 461-63, 101 S.Ct. 715, 722-23, 66 L.Ed.2d 659 (1981); Vance v. Bradley, 440 U.S. 93, 97-98, 99 S.Ct. 939, 942-943, 59 L.Ed.2d 171 (1979).
Because the respective challengers of the statute are differently situated, their equal protection claims must be evaluated separately. RIWPC is excluded from the benefits of the exception to R.I.Gen.Laws § 11-19-1 because it is an issue-oriented political action group and not a political party. The Citizens Party, though indubitably a legitimate political party, may not partake of the statutory largesse because of its dismal electoral performance: it did not run a candidate for governor who garnered at least 5% of the vote.
The defendants implore that the state's interest, the paramount end of R.I. Gen.Laws § 11-19-1, is to control gambling. While there can be no argument that the state may legitimately regulate games of chance, the question in an equal protection context is whether the classifications created by the exception conduce to that end. Unfortunately, that question is somewhat difficult to answer with regard to this specific statute. The state legislature, having chosen to limit gambling, subsequently created an exception which allowed one particular class of entities to conduct certain games of chance in some circumstances. In practice, the exception could allow the two major political parties to conduct up to 480 raffles per year in the aggregate, see n. 5 ante, and permit a limitless number of certified candidates to conduct one each during election years. The argument now advanced to buttress the exception  the ostensible desire to improve the fundraising capabilities of the major parties and of certified candidates  is not at all related to the reason underlying the enactment of the original statute.[7] Thus, divining a relationship between the questioned exception and the initial (lawful) purpose of the statute is uncomfortably akin to comparing apples and oranges. The exception, even on its narrowest terms, directly contradicts the state's original statutory objective. That inescapable fact must comprise the context in which the plaintiffs' equal protection challenges are construed.
By limiting the exception to the established major parties, the defendants say, the Act prevents any group from calling *1417 itself a "political association" purely to gain a sufficient toehold to stage an (otherwise forbidden) raffle. But, if the objective is to prevent fraudulent or deceptive practices, the distinction is much too broadly drawn. Legitimate political associations, as well as would-be deceivers, are sweepingly excluded in an offhandedly indiscriminate manner. And, since it would be a simple matter to require the applicant to show evidence of incorporation as a political party, or to demonstrate some (much less onerous) bona fides, in order to segregate the genuine political wheat from the bogus opportunistic chaff, this importuning must be viewed as specious.
But, the fact that the state has miscast its argument is not necessarily fatal. Although not raised directly by the defendants, the spectre of an ever-increasing googol of lotteries hovers in the wings of their lamentation. Political action groups have become a common way of expressing public opinion and of attempting to influence the political process. If such entities were accorded the same freedom to conduct lotteries as political parties, the incidence of this sort of gambling would undoubtedly increase geometrically, and the original prohibition against games of chance would be seriously undermined. Accordingly, the distinction between political parties and social action groups does bear some rational relationship to the overall (legitimate) purpose of limiting gambling. When the General Assembly, having decided to breach the original ban by allowing political parties and candidates to sponsor lotteries, tailored the exception to exclude other types of entities (such as political action groups), the choice was a rational one.
The primary focus of a political party organization is the election of candidates; its structure tends to follow well-defined lines; its format is dictated by state law; and it is likely to be, by definition, a long-term fixture on the political landscape. Social action groups are much more diverse creatures, often little more than loosely-knit coalitions of interest groups. They come and go, depending upon the issues which are at the forefront at any given time. And, they are cause-oriented rather than candidate-oriented. The Equal Protection Clause requires only that persons similarly situated receive like treatment at the hands of the sovereign. Johnson v. Robison, 415 U.S. 361, 374-75, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974). Classifications must be fairly shaped and predicated upon a reasonable basis in light of the salient governmental interest to be protected, but absolute perfection is not required. E.g., Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). The generie distinction between social action groups (or for that matter, political action committees) on the one hand, and political parties on the other hand, is not, given the state's vital stake in confining legalized gambling quite narrowly, an irrational one. Accordingly, RIWPC's equal protection challenge to the Act avails it naught.
By contrast, however, the Citizens Party is excluded from the world of raffles and 20-week clubs merely because its state-wide candidates have not shown much vote-getting prowess with the electorate in the recent past. That distinction is wholly unrelated to the overall purpose of limiting gambling  whether or not a party can demonstrate a particular level of partisan support at the ballot-box has nothing to do with its reliability or trustworthiness as a lottery sponsor. And, the Citizens Party (which, on this record, has elected no city, town, ward, or district committees) seeks only to hold one lottery per year, a paltry increment which would have a negligible impact on the total amount of gambling in Rhode Island. Thus, line-drawing between political parties on the basis of electoral support cannot by any standard be viewed as being rationally related to the expressed purpose of R.I.Gen.Laws § 11-19-1. The Citizens Party's equal protection challenge seems, at first blush, to possess compelling force even under the more relaxed standard of traditional scrutiny.
The court is mindful, however, of the fact that the exception was enacted for a *1418 completely different purpose than the original statute. Thus, the Citizens Party's equal protection challenge should also be weighed in the scales of the legislature's evident decision to improve the fundraising capabilities of political parties. In this light, the exception, as drafted and in practice, may be construed as serving the goal of maintaining the two-party system.
The Supreme Court has decided several cases challenging state laws which required minor parties to demonstrate a certain level of popular support before securing ballot access. See, e.g., Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). "The Court has apparently sanctioned as a state interest the limited promotion of the two-party system and has reduced its criticism of governmental schemes insulating two particular parties from the effective challenges of the other candidates." Greenberg, 497 F.Supp. at 781. But, in those cases, there was a rational basis for requiring a party to demonstrate political support to merit a place on the ballot. Space is, after all, at a premium on voting machines; limits are reasonably necessary to preserve the sanity of overtaxed government officials charged with supervision of the election process; candidates themselves have comparable access; voters must be protected against misleading listings; and budgetary constraints are at work, given the expense inherent in the conduct of elections.
In the context of the case at bar, however, political support has become a requirement for raising funds in a particular way. There is no sensible reason for requiring a party to enjoy a certain amount of popularity before allowing it to raise money; indeed, these defendants have not been able to make even the feeblest of stabs at articulating one. And, since parties often need money to popularize themselves, the restriction which has been read into R.I.Gen.Laws § 11-19-1 has an almost tautological impact.
As the district court which ruled a federal statute denying preferential mailing rates to certain minority political parties and independent candidates unconstitutional has noted:
Limiting excess factionalism as a means of attaining other goals is arguably legitimate.... There is no suggestion, however, that entrenchment of the present two parties by stifling the speech of competitors is a legitimate interest of government. While Congress may choose not to offer any incentives or assistance to new parties or independent candidates, it may not act to create disincentives for the purpose of protecting the two parties which now share control of the government.
Greenberg, 497 F.Supp. at 781.
By conferring a fundraising benefit on the two major parties, the exception simply promotes their interests over those of their less popular opponents without serving any legally cognizable governmental end. There is an utter absence of any reasonable basis for constructing the classification contained within the statute so as to exclude minority political parties. Accordingly, the Act, as it has been construed and applied, invidiously denies equal protection of the laws to the Citizens Party.

V. RELIEF.
For the reasons alluded to above, the Act unconstitutionally intrudes upon protected freedoms of expression and of association, and is vulnerable to the first amendment challenge mounted by both RIWPC and by the Citizens Party. And, in the case of the latter, the statute transgresses the boundaries of the Equal Protection Clause as well. Thus, the court must grant some relief to the plaintiffs. Yet, notwithstanding that the diagnosis of unconstitutionality *1419 has been made, the precise nature of the judicial unguent to be prescribed is itself subject to competing considerations.
This court is cognizant that a ruling of unconstitutionality is strong (though necessary) medicine; it is, by its very nature, a mixed blessing: although relentless patrol of the perimeters of the Constitution is plainly required in order to safeguard the fundamental rights and liberties of the citizenry, a declaration of invalidity ipso facto frustrates the will of the people as expressed by and through their elected legislators. "Therefore, a court should refrain from invalidating more of the statute than is necessary." Regan v. Time, Inc., ___ U.S. ___, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). And, where fidelity to the Constitution demands that a court strike down a portion of a statute, a presumption arises in favor of severability as to the remainder. Id. "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). Accord Regan v. Time, Inc., 104 S.Ct. at 3269; Buckley v. Valeo, 424 U.S. at 108-09, 96 S.Ct. at 677; United States v. Jackson, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968); Members of the Jamestown School Committee v. Schmidt, 699 F.2d 1, 13 (1st Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983). The Rhode Island Supreme Court has spoken in much the same tongue. See Landrigan v. McElroy, 457 A.2d 1056, 1061 (R.I.1983); Baffoni v. Rhode Island Department of Health, 118 R.I. 226, 235-36, 373 A.2d 184, 189 (1977); Chartier Real Estate Co. v. Chafee, 101 R.I. 544, 556, 225 A.2d 766, 773 (1967). "[L]egislative intent is the decisive factor." Landrigan, 457 A.2d at 1061.
These thoughtful tenets are given a special gloss in this instance, as the Rhode Island General Assembly has taken pains to express its overall view of the independence of the various provisions of chapter 19 of title 11 of the Rhode Island General Laws. Thus, R.I.Gen.Laws § 11-19-45 (1983), enacted prior to, but earlier in the same legislative session as, the current version of the proviso which now adorns § 11-19-1, stipulates that:
If any section of this chapter or the application thereof to any person or circumstance is held invalid by a court of competent jurisdiction, the remainder of the chapter and the application of such section to other persons or circumstances shall not be affected thereby. The invalidity or unconstitutionality of any section or sections or part of any section or sections of this chapter shall not affect the validity of the remainder of this chapter and to this end the sections of this chapter are severable.
P.L.1983, ch. 188 § 2 (codified at R.I.Gen. Laws § 11-19-45 (1983)).
Such a severability clause is generally to be honored by a reviewing court; even though enacted in advance of the disputed statutory language, it suffices to create a presumption of separability. See Sutherland on Statutory Construction, § 44.09 at 351 (4th ed. 1972).
The application of these principles in the case at bar renders it unnecessary for the court to invalidate the Act in its entirety. The complete text of R.I.Gen. Laws § 11-19-1, as amended, is set forth in the margin.[8] The first sentence of the *1420 statute, which bars lotteries as a general matter, has graced the state's legal lexicon, in essentially the same form, since the nineteenth century. See, e.g., R.I.G.L. 1896, ch. 283 § 1. It was not until 1979 that the exemption in favor of party committees appeared, see P.L.1979, ch. 389 § 1, and the extension of that benefit to certified candidates was not added until 1983. P.L.1983, ch. 279 § 1. Under these circumstances, it is plain that the generic proscription is separable from, and can stand independently of, the proviso.
The next question, therefore, is whether the excepting provision should be rewritten to conform to the exigencies of the Constitution. It is true that where a statute is defective because of underinclusion (the vice which infects the proviso), two remedial alternatives are possible: a court may declare the ordinance a nullity and order that the benefits not extend to the class that the legislature intended to bless, or it may elongate the statutory coverage to include those who are aggrieved by the exclusion. Welsh v. United States, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring). See also Califano v. Westcott, 443 U.S. 76, 89, 99 S.Ct. 2655, 2663, 61 L.Ed.2d 382 (1979).
Yet, judges should be loath to usurp essentially legislative functions. There is absolutely no way to tell which direction the state legislature, if confronted with a choice between permitting other organizations (e.g., the Citizens Party) to hold raffles or debarring all political parties from doing so, would take. Without an adequate signal from the Rhode Island General Assembly, this court is disinclined to essay a prototypically legislative judgment in an attempt judicially to rewrite the statute. The court is, therefore, constrained against widening the proviso to include these plaintiffs.
In turn, that decision poses the final question: should the entire proviso be stricken, or merely that portion of it which relates to political organizations as opposed to certified candidates? On its face, the language of R.I.Gen.Laws § 11-19-45 appears to counsel in favor of the latter course ("If any section of this chapter or the application thereof to any person or circumstance is held invalid ... the application of such section to other persons or circumstances shall not be affected thereby.") (emphasis supplied). The court's resolve to choose this alternative is bolstered inasmuch as the plaintiffs have never challenged the proviso insofar as it relates to certified candidates. There is nothing to indicate that the benefit so conferred is susceptible to attack on constitutional grounds. The decision to look with special favor upon certified candidates implicates other concerns than the decision to benefit party committees; it does not appear directly to affect either the first amendment or the equal protection rights of these plaintiffs. And, there is no reason to believe that all aspirants for public office are not afforded evenhanded treatment along the road to certification under the state's comprehensive election law scheme.
On this record, the proviso, insofar as it relates to certified candidates, is sufficiently distinct that it may be salvaged. By addressing the discernible flaw in the Act in this precise fashion, the will of the people, as expressed by the General Assembly, will be preserved to the maximum (constitutionally permissible) extent.

VI. CONCLUSION.
If the Rhode Island General Assembly chooses legislatively to erode the state's *1421 time-tested barriers against legalized gambling, that is its due. Such policy choices are, after all, within the legislative domain. But, the General Assembly must do so evenhandedly, and in a manner not offensive to the Constitution. Freedoms of association and expression are precious rights, not lightly to be surrendered; and the equal protection of the laws is a fundamental entitlement of all Americans. In its present form, the Act, for the reasons and in the respects noted, invades these forbidden precincts.
There exists no genuine issue as to any material fact. The Act is, as a matter of law, antithetic to the commands of the Constitution. The court, therefore, grants the plaintiffs' motion for partial summary judgment, and declares that the proviso contained in R.I.Gen.Laws § 11-19-1, as amended, insofar as it extends to political party committees (state, city, town, ward and/or district), is unconstitutional. Accordingly, the court will permanently enjoin the defendants, their respective agents, servants, employees, and privies, and all persons acting in concert with them or on their behalf, from authorizing or permitting the conduct of any raffle or 20-week club by any such state, city, town, ward or district committee. Counsel for the plaintiffs shall prepare and present to the court for entry in chambers on May 31, 1985 at 8:45 a.m. a form of order and injunction consonant with the teachings of this opinion. The order shall, inter alia, expressly provide that nothing contained therein shall (i) invalidate or affect the enforceability of the first sentence of the Act, or (ii) debar the defendants from authorizing and/or allowing duly certified candidates for public office from undertaking raffles and/or 20-week clubs to the extent presently sanctioned by the Act.
The defendants' cross motion for judgment on the pleadings is denied, and the aforementioned order shall so stipulate. The defendants may be heard on May 31, at the time hereinbefore appointed, as to the form of the order to be entered.
Insofar as the plaintiffs, or any or all of them, wish to pursue their respective claims for money damages, the court will, at the May 31 chambers conference, assign a date certain for trial on the issue of damages on the court's June, 1985 docket.
So ordered.
NOTES
[1] At the time suit was instituted, Dennis J. Roberts II was serving as attorney general. He has since been supplanted in that elective office by Arlene Violet. Inasmuch as Roberts was sued only in his official capacity, see plaintiffs' amended complaint at ¶ 7, Violet has by operation of law, Fed.R.Civ.P. 25(d)(1), been substituted as a party defendant in his place and stead.
[2] Inasmuch as RIWPC has met the "injury in fact" test, its standing cannot be undercut by an argument that its financial stake in the outcome of the litigation is not large. United States v. SCRAP, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973); American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1108 (11th Cir.1983). It is the quality of the harm, not its monetary quantification, which necessarily controls.
[3] Inasmuch as the rights of the PAC are subsumed by, and cannot conceivably be greater than, those of RIWPC, the remainder of this opinion will omit as supererogatory any reference to the PAC.
[4] The certification of a controlling question of state law to a state tribunal generally serves as a surrogate for, not a complement to, abstention. Rogers v. Okin, 738 F.2d 1, 5 (1st Cir.1984). And, the standards by which a decision as to whether or not to certify should be judged, albeit different from those which govern abstention determinations, are analogous in some important respects. E.g., Lehman Brothers v. Schein, 416 U.S. 386, 390-91, 94 S.Ct. 1741, 1743-44, 40 L.Ed.2d 215 (1974); Scheinberg, 659 F.2d at 481.
[5] It is uncontested that the only "committees" meeting the definitions of the Act on the litigants' shared construction are the state, city, town, ward and district committees of the Republican and Democratic parties, respectively. Statement at 9 ¶ 24. It is similarly undisputed that, under current Rhode Island law, each party has, in the aggregate, 240 such committees (1 state committee, 50 senatorial district committees, 100 representative district committees, 39 city and town committees, and 50 ward committees. Id. at 9 ¶ 25.
[6] Although the Court professed to be applying strict scrutiny in both American Party and Storer, it actually applied a less demanding standard. While the state's interests were required to be compelling, not merely legitimate, the Court did not always ask whether a less restrictive alternative would serve to protect those interests. And, the Court seems in some instances to have required the challengers to prove that a less restrictive alternative existed. E.g., American Party, 415 U.S. at 780, 94 S.Ct. at 1305; Storer, 415 U.S. at 736, 94 S.Ct. at 1282. See also Tribe, American Constitutional Law 783 (1979).
[7] There is no formal legislative history recorded in the annals of the state legislature to shed light upon the passage of the Act itself, or upon the adoption of the pertinent amendments. The defendants' lame attempt to supply a post hoc rationalization for the 1983 amendment, in the form of an unsworn, self-serving letter from a legislative sponsor of that initiative, written after suit had been instituted and appended to the state's brief, should not be dignified by extensive comment. That gambit proves nothing (except, perhaps, that the state's attorneys could benefit from a refresher course in the law of evidence). Cf. United States v. Kobrosky, 711 F.2d 449, 456 (1st Cir.1983).
[8] The full text of the Act (current version) reads as follows:

11-19-1. Promotion of lotteries.  Every person not authorized by the Rhode Island state police who shall, directly or indirectly, set up, put forth, carry on, promote or draw, publicly or privately, any lottery, chance, game or device of any nature or kind whatsoever, or by whatsoever name the same may be called, for the purpose of exposing, setting for sale or disposing of any money, houses, lands, merchandise or articles of value, or shall sell or expose to sale lottery policies, purporting to be governed by the drawing of any public or private lottery, or shall sign or endorse any book, document or paper whatsoever, for the purpose of enabling others to sell or expose to sale, lottery policies, shall be deemed guilty of a felony and shall be imprisoned not exceeding two (2) years or be fined not exceeding two thousand dollars ($2,000). Provided, however, That any state, city, town, ward or district committee elected pursuant to the provisions of title 17, or certified candidates, but not both, as defined in title 17, shall be allowed to conduct that lottery commonly known as a "twenty (20) week club" or conduct a raffle once within a twelve-month period subsequent to notification to the Rhode Island Lottery Commission. For the purposes of this section a certified candidate shall not include any state, city, town, ward or district committee person.